**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 1:23CR312 |
| RALPH HERMAN KAHLER, | |
| Defendant. | |

**MEMORANDUM IN AID OF SENTENCING**

Ralph Kahler will be before the Court for sentencing on January 19, 2024, after having accepted responsibility for one count of Parading and Picketing at the U.S. Capitol on January 6, 2021, in violation of 40 U.S.C. 5104(e)(2)(G).

On January 6, 2021, Mr. Kahler and his wife, Suzanne Kahler, traveled to the district from their home in northern Virginia to attend the rally organized by President Trump and his allies. After the rally, they followed the swell of the crowd towards the Capitol and onto the Capitol grounds. Still following the crowds, they entered the building through the Senate Wing Door at 3:07 p.m., approximately one hour after the door had been breached by others. After milling around for three minutes, the couple left. While inside the building, the Kahlers did not interact with any police officers or anyone else. They were peaceful and unassuming. They subsequently accepted responsibility for their conduct quickly and without reservation. Prior to January 6 and after, Mr. Kahler never posted or chatted about

1

January 6—let alone anything political—on Facebook.[1] If there was ever a case deserving of a sentence of time served[2] or a brief period of unsupervised probation, this is it.

I.     **The sentencing factors support a brief period of unsupervised probation**.

a. **Mr. Kahler has lived a law-abiding life alongside his wife of 43 years, Suzanne**.

Ralph Kahler was born in Albany, New York, in 1959. He is 64 years old. Mr. Kahler and his three siblings were raised in a close-knit, working class home. His father was employed as a welder, butcher, and a mason. His mother was a tailor. After high school, Mr. Kahler earned a B.A. from State University of New York Postdam. Mr. Kahler was gainfully employed since high school, when he worked at a gas station and a country club, until his retirement in 2012. After college, he worked in the information technology field, first at American Management Systems for five years, until he accepted a position at Oracle. After Oracle, he worked at four other companies in the same technology space. He retired as a Vice President from Synfusion in 2012.

Mr. Kahler met his wife, Suzanne, at American Management Systems. At the time, Suzanne worked in the marketing department. The two hit it off at work events

---

[1] Facebook is the only social media the Kahlers use. They use it for Facebook marketplace and to keep in touch with a small group of family members.

[2] As explained below, the Kahlers were arrested at their home on July 6, 2023.  They spent several hours in custody in the courthouse cellblock pending their initial appearance. The government did not request detention. They were released after the initial appearance.

and started dating. The couple married on June 9, 1990. They have lived in the same house in Great Falls, Virginia, which they purchased in 1998. Their close-knit community of neighbors support them. One neighbor writes, "Ralph and Suzanne have always been friendly and generous in helping both friends and neighbors."[3] The couple do not have children but are very close to extended family and have assumed a grandparent role to their 6-year-old grandniece.

Mr. Kahler has never been arrested for any offense. He is a self-described "rule follower." A close family member writes, "Ralph's personal integrity stands heads and shoulders above all of the people I have encountered. . . "[4] It is an understatement to say that his arrest in this case—and the news reports of it in his community—have been painfully embarrassing for a man who cannot recall the last time he got so much as a parking ticket.

### b.  Mr. Kahler is generally healthy, though he has suffered a stroke.

Mr. Kahler suffered from a stroke on March 30, 2022, after which doctors performed surgery to clear out the left artery. He does not experience major symptoms of the stroke but anticipates that he will have to undergo another surgery to clear out the left artery. Mr. Kahler does not suffer from any mental health disorders. As for drugs and alcohol, he has never used drugs and he rarely drinks alcohol.

---

[3] Letter of Greg Davis, attached as part of Exh. 1.
[4] Letter of Stephen Wolfe, Exh. 1.

**c. The nature and circumstances of the offense support a sentence of time-served or a brief period of unsupervised probation**.

As described in the statement of offense and PSR, the Kahlers traveled to the Capitol to hear President Trump speak. They had supported Mr. Trump and wanted to hear him speak for what they thought would be the last time. After the speeches, which they could not hear very well, they followed the crowd from the Ellipse to the Capitol. At the time, they believed that there were going to be more speeches to listen to at the Capitol, including possibly another appearance by President Trump. Though they live in Northern Virginia, the Kahlers had never been on the Capitol grounds before. While the crowd around them was rowdy, they did not personally witness any violence or destruction. One hour after the building had been breached, they followed the crowd into the building through open doors. Reflecting on the day, Mr. Kahler cannot really describe what the couple was thinking when they followed the crowd through open doors into the building, only to say, they were not thinking. They certainly did not set out to "storm the capitol" or to interfere with the certification of the vote. As they walked on the grounds and into the building, they were not in any way rowdy or disruptive. They did not interact with any police officers. They did not shout or say anything. They did not witness any violence or destruction. No one told the couple to leave. Just minutes after the couple entered the building, they made their way out, voluntarily.

Over two years later, approximately thirty law enforcement agents roused the couple from their beds at 8 a.m. by banging on the door. The agents were armed with long rifles and handguns. At first, the Kahlers had no idea what was going on. Mr.

Kahler recalls his shock and humiliation as police vehicles lined their neighbor's driveway and armed officers streamed into their home to execute a search warrant. The agents immediately handcuffed Mr. Kahler and shackled his ankles. He was wearing only a bathrobe. Later, agents ushered the couple out of their home in handcuffs as their neighbors looked on. They were taken to the FBI building and interrogated. During the interrogation, Mr. Kahler freely discussed what he did on January 6.[5] Later, they were taken to cellblock in the courthouse where they waited until their Initial Appearance. All told, the couple was in custody for approximately eight hours. Undersigned counsel submits that the circumstances of the Kahlers' arrest far exceeded what was necessary for a petty misdemeanor offense, especially because the Kahlers would have responded to a summons to appear.

### d. A sentence of time-served or a brief period of unsupervised probation will meet the goals of sentencing.

Mr. Kahler has been compliant with conditions of release since his arrest over six months ago. The circumstances of his arrest and involvement in the federal criminal system is more than sufficient to deter him from ever again having a brief lapse of judgment like the one he had on January 6. There is zero chance that he will ever re-offend in any manner. This assertion is supported by U.S. Sentencing Commission Data which found that offenders with zero criminal history points have

---

[5] The government takes Mr. Kahler's statement "I don't deserve this" totally out of context. Mr. Kahler was terrified and shocked to have been roused from his bed and shackled by armed federal agents. He was not expressing a lack of remorse for January 6. Rather, he was expressing that the surprise arrest by armed agents was not necessary. Mr. Kahler has demonstrated his shame remorse through his plea and, importantly, in private conversations with friends and loved ones. See Letters attached as Exhibit 1.

a rate of reconviction of between 3 and 5 percent.[6] Of course, these numbers likely do not reflect offenders convicted of petty misdemeanors, which further supports that the chance that Mr. Kahler would ever reoffend is next to nil. Indeed, he has no desire to ever participate in any type of rally again. Likewise, the instant prosecution will serve as a deterrence to other would-be petty misdemeanants. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[7] In brief, the most effective deterrent is the certainty of punishment, rather than its length.[8]

The requested sentence will also avoid unwarranted disparities with other parading and picketing cases resolved in this district. As of November 8, 2023, there have been 371 cases in which defendants have been sentenced under 40 USC § 5104 only as Mr. Kahler will be. Of those 371 cases, 128 defendants were sentenced to straight probation and 93 were sentenced to probation with some period of home confinement. Thus 55% of the 317 received a sentence of probation, no custody. The remainder received short periods of intermittent or straight incarceration. A sample review of the facts of the cases in which incarceration was imposed shows that in

---

[6] See Ruben Castillo et al., Recidivism and the "First Offender" 13 (2004), available at https://www.ussc.gov/research/research-publications/recidivism-and-first-offender.

[6] Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 28 (2006), available at https://scholarship.law.umn.edu/faculty_articles/495.

[8] See, e.g., The Growth of Incarceration in the United States 131 (Jeremy Travis et al. eds., 2014); Five Things About Deterrence, Nat'l Inst. of Just., https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

cases where jail was imposed, aggravating factors were present that are not present in Mr. Kahler's case. Indeed, the inapposite cases the government cites are perfect examples of petty misdemeanor cases in which the defendants' conduct was more far aggravated than Mr. Kahler's. Gov. Memo at 11, 12. First, the government strains to compare Mr. Kahler's case to *United States v. Lattanzi*, 22CR28. In that case, the defendant entered through a broken window and admitted to holding a flag that was stained with blood and mace.[9] When he was interviewed, he initially denied entering the building altogether. By contrast, Mr. Kahler walked in through an open door, never denied entering the building, and did not carry any dangerous items with him. Next, the government refers to *United States v. Bronsberg*, 22CR44. This case is also easily distinguishable. Ms. Bronsberg entered the building twice, was present at entrances for three separate breaches of the building, entered, remained, *drank alcohol in the Senate Conference room*, and later bragged about going in the building.[10] Mr. Kahler's conduct is nowhere near as aggravated as Ms. Bronsberg's. Finally, the government points to *United States v. Modrell*. Notably, Mr. Modrell did <u>not</u> receive intermittent incarceration, which supports undersigned counsel's request in Mr. Kahler's case. Mr. Modrell entered through a broken window, spent approximately 25 minutes in the building, and traversed much of the building, including the crypt.[11] By contrast, the Kahlers entered briefly and left after three minutes. In short, a closer look at the cases to which the government strains to

---

[9] 22CR28, ECF. No. 32
[10] 21CR144, ECF. No. 70
[11] 23CR1, ECF. No. 32

compare to Mr. Kahler's case demonstrates that any period of incarceration for Mr. Kahler would be manifestly unwarranted and excessive.

Finally, the experience of Mr. Kahler's arrest and federal prosecution alone is a just punishment. After a lifetime of hard work, strict adherence to law, and commitment to family and faith, Mr. Kahler was devastated to be arrested, handcuffed, and led out of his home by agents for the neighborhood to see. He has shared his remorse and shame with close friends and loved ones.[12] Mr. Kahler has said many times that his parents would roll over in their graves to know that he did something that caused him to be arrested and entangled in the criminal legal system. He has lost nights of sleep, anxious about this case. He has reflected on what led to his lapse of judgment on January 6 and vows it will never happen again. In short, Mr. Kahler has been justly punished for his aberrant and very brief lack of judgment. Undersigned counsel respectfully submits no additional punishment is necessary to achieve the goals of sentencing in this case.

## Conclusion

For the reasons herein, counsel respectfully submits that short period of unsupervised probation with a condition of community service or a sentence of time-served will achieve the goals of sentencing in this case. Indeed, those goals have already been met through Mr. Kahler's arrest, conviction of a criminal offense, and period of compliance of with conditions of release.

---

[12] See Letter of Perry Keating ("[Ralph and Suzanne] are personally humiliated by the events and disappointed by what transpired.").

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500